COLEMAN, Justice,
for the Court:
¶ 1. The instant matter is before the Court on appeal filed by Brandon Q. Gales against the State of Mississippi. Gales was convicted in the Washington County Circuit Court of armed robbery and conspiracy to commit armed robbery with sentences of life imprisonment and five years, ■respectively. Gales appealed, raising three issues. While the trial court committed error, such errors are harmless, and the remaining issues lack merit. Thus, the Court affirms the judgment of the trial court, albeit on different grounds.

*636
FACTS AND PROCEDURAL HISTORY

¶2. On December 19, 2011, at about 10:00 p.m., Abdulhakim Weber was in the process of closing his convenience store, the Hyatt Food Mart, for the night. As an employee was about to lock the front door, two black males masked with white t-shirts came into the store. One of the intruders had a pistol and yelled “nobody move” before firing a shot into the ceiling. The shooter took the money that Weber had been counting at the register, while the shooter’s partner took money from Weber’s pockets. The shooter then demanded a pack of cigarettes before both robbers fled the scene. Weber’s employee called 911.
¶ 3. The store was equipped with twelve security cameras, which captured the quick exchange. The video shows two black males, wearing white t-shirts as masks, entering the store. The shooter wore a black hoodie, light blue jeans, and brown casual shoes. The shooter’s partner wore a black sweatshirt, gray pants, and black and gray shoes.
¶ 4. Within minutes of the 911 call, officers arrived at the store and viewed the surveillance footage. Officer Jeremy Ar-endale described the fugitives to dispatch, which issued a “be on the look out” description. The description depicted a black male with a blue shirt, black pants, and a white hoodie and did not describe the suspect’s footwear. Soon after hearing the description, Officer Tabari Thomas spotted a young black male, later identified as Brandon Gales, running roughly five blocks from the Hyatt Food Mart. According to Officer Thomas, Gales was running but attempted to make it seem like he was walking upon noticing the police presence. Officer Thomas stopped Gales and asked him why he was out of breath. Gales responded that he had just left a gambling house.
¶ 5. Officer Thomas then conducted a Terry[1] pat-down of Gales. While Officer Thomas did not find a weapon on Gales, he felt a bulge in Gales’s back pocket. According to his testimony, Officer Thomas either asked Gales to “let him see what was in his pocket” or Gales voluntarily emptied his pockets, showing him money that Gales said he had won gambling. Officer Thomas asked dispatch for another description of the suspects. Dispatch responded, describing an individual with a black hoodie, light jeans, and brown casual shoes. Gales was not wearing a black hoodie, but instead a gray, long-sleeved shirt; however, he was wearing light jeans and brown casual shoes. Officer Thomas noted that Gales seemed suspicious, as he was out of breath and wearing light clothes for a December night. Because Gales partially matched the description of one of the robbers, Officer Thomas handcuffed and detained Gales for further investigation and soon after drove him to the crime scene.
¶ 6. Arriving at the Hyatt Food Mart, Officer Thomas told Officer Arendale that he had detained a person of interest. Officer Arendale spoke with Gales and photographed the money in Gales’s pockets. There are some discrepancies in the record as to what exactly happened next. According to Officer Arendale’s recount, he went back into the store and asked Weber how much money was stolen and in what denominations. Officer Arendale returned to Gales, took the money from his pockets, and proceeded to count the money, which Officer Arendale testified was consistent with Weber’s description. Officer Aren-dale, noting a five dollar bill with a red stamp on it, went back to Weber and asked him if there was anything unusual *637 about any of the bills. Weber proceeded to describe a five dollar bill with a red stamp on it that he had received from the bank.
¶ 7. According to Weber’s recount, after the police detained the suspect, Officer Arendale immediately brought the money inside the store and placed it on the counter. Officer Arendale asked Weber if he knew any of the serial numbers, and, after viewing the bills, Weber recognized the bill with the stamp on it as one that he had acquired through regular business and not from a bank. Gales was placed under arrest and brought to the police station once the police connected him to the bill with the red stamp.
¶8. At the station, officers swabbed Gales’s hands for gunshot residue. The swabs were sent to the Mississippi Crime Lab, where forensic scientist Chad Suggs analyzed them for the presence of gunshot residue. Suggs found only a particle indicative of gunshot residue on the back of Gales’s left hand; however, he was unable to “identify it as gunshot residue to the exclusion of all other environmental sources.”
¶ 9. The morning after Gales’s arrest, officers found a black hoodie and a Smith & Wesson handgun in an alley near North Harvey and Bland Street, near where Gales was detained. The handgun and a spent shell casing found at the crime scene were sent to the crime lab for comparison. Forensic scientist Brian Mclntire determined that the bullet fired at the Hyatt Food Mart had been fired from the discovered pistol.
¶ 10. Gales was indicted for two counts of armed robbery and one count of conspiracy to commit armed robbery. Gales filed a motion to suppress all evidence stemming from his unreasonable search and seizure. A hearing was held on the motion, after which the trial court entered an order denying the motion and finding that Officer Thomas’s stop and frisk of Gales was proper under Terry. The trial court granted a directed verdict on one count of armed robbery. A jury convicted Gales on the remaining counts of armed robbery and conspiracy, and the trial court sentenced him to life imprisonment and five years, respectively, with the sentences to run concurrently. Gales appealed.

DISCUSSION

¶ 11. For the sake of organization, Gales’s arguments have been divided into five issues. The first three issues concern alleged improprieties as to the Terry stop, Gales’s arrest, and the recitation of Miranda warnings, respectively, while the remaining two arguments focus on the narration of the surveillance video and whether there was legal and evidentiary sufficiency supporting the verdict.
I. Whether the trial court erred by refusing to suppress the fruits of an impermissible stop and an unreasonable warrantless search of Gales, when the stated reason for the stop was to conduct a Terry pat-down, but the search and seizure of Gales did not meet the constitutional prerequisites for the police officer’s actions.
¶ 12. Gales’s first issue deals with whether Officer Thomas properly performed a Terry stop in detaining Gales. For the sake of clarity, the issue has been subdivided into three parts: (a) the initial Terry stop, (b) the Terry pat-down, and (c) the continued detainment and search of Gales following the Terry stop.
¶ 13. The Court applies a mixed standard of review to Fourth-Amendment claims. Eaddy v. State, 63 So.3d 1209, 1212 (¶ 11) (Miss.2011) (citing Dies v. *638 State, 926 So.2d 910, 917 (Miss.2006)). “Whether probable cause or reasonable suspicion exists is subject to a de novo review. But the Court limits the de novo review of the trial court’s determination to historical facts reviewed under the substantial evidence and clearly erroneous standards.” Id. (emphasis added) (citations omitted). When reviewing evidentia-ry rulings made by a trial court, the Court employs an abuse of discretion standard. Brown v. State, 965 So.2d 1023, 1026 (¶ 10) (Miss.2007) (citing Peterson v. State, 671 So.2d 647, 655 (Miss.1996), overruled on other grounds by Caldwell v. State, 6 So.3d 1076 (Miss.2009)). “[The] Court must first determine if the proper legal standards were applied.” Id. “Where error involves the admission or exclusion of evidence, [the] Court will not reverse unless the error adversely affects a substantial right of a party.” Ladnier v. State, 878 So.2d 926, 933 (¶ 27) (Miss.2004) (quoting Whitten v. Cox, 799 So.2d 1, 13 (Miss.2000)).
A The Initial Stop
¶ 14. First, Gales argues that Officer Thomas did not have a “reasonable suspicion” to stop Gales, as Officer Thomas was responding to the initial,' inaccurate description, which described a black male wearing a blue shirt, black pants, and a white hoodie. The description also stated that the suspects were headed in the direction of Belle Aire Street; however, Gales was not walking in that direction. It should be noted that in Gales’s motion, to suppress, which the trial court denied, Gales conceded that “the Greenville Police Department had the right to stop and question the defendant, and even the right to conduct a pat-down for weapons.” Accordingly, the issue of whether Officer Thomas had legal grounds to conduct the Terry stop of Gales in the first place was conceded and not argued before the trial court. “Failure to raise an issue at trial bars consideration on an appellate level.” Walker v. State, 913 So.2d 198, 217 (¶49) (Miss.2005); see also Johnson v. State, — So.3d—,—, 2014 WL 971542, *4 (¶ 6) (Miss. Mar. 13, 2014). Regardless, the Court will proceed with an analysis of the stop and pat-down.
¶ 15. In response, the State argues that Gales essentially is attacking Officer Thomas’s credibility. Further, the State notes that the trial court sits as the finder of fact at suppression hearings and thus is solely responsible for determining witness credibility and resolving any conflicts in the evidence, citing Glasper v. State, 914 So.2d 708 (Miss.2005). The State contends ■ that Officer Thomas had a reasonable suspicion to stop Gales because (1) he was spotted minutes after an armed robbery and only about five blocks away from the crime scene; (2) he partially matched the description of one of the robbers; and (3) he was running and appeared nervous.
¶ 16. “Police officers may detain a person for a brief, investigatory stop consistent with the Fourth Amendment when the officers have ‘reasonable suspicion, grounded in specific and articulable facts ... ’ that allows the officers to conclude the suspect is wanted in connection with criminal behavior.” Eaddy, 63 So.3d at 1213 (¶ 14) (citing Walker v. State, 881 So.2d 820, 826 (Miss.2004)); see also Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Based on the evidence in the record, the trial court in the case sub judice did not err in finding that Officer Thomas had formed a reasonable suspicion in his detention of Gales. Gales was in the immediate vicinity of the crime scene soon after the robbery, partially matched the description of one of the robbers, and appeared nervous. Officer Thomas’s suspicions were further piqued when Gales, who was wearing casual shoes, stopped running *639 when he noticed Officer Thomas’s presence. Based on the above facts, Officer Thomas’s actions were grounded in a reasonable suspicion that Gales was connected with the armed robbery.

B. Officer Thomas’s Terry Pat-Down

¶ 17. Second, Gales argues that, even assuming Officer Thomas had reasonable suspicion initially to stop Gales, Officer Thomas exceeded the scope of Terry by ordering Gales to take money out of his pocket, knowing that it was not a weapon. Gales argues that such a search violates the “plain feel” doctrine enunciated by the Supreme Court in Minnesota v. Dickerson, 508 U.S. 366, 375-76, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) (“If a police officer lawfully pats down a suspect’s outer clothing and feels an object whose contour or mass makes its identity immediately apparent ... its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.”). The State argues that Gales misconstrues the record and quotes Officer Thomas’s statement at the suppression hearing: “when I felt that bulge in his pocket, I didn’t know if it was a knife or something wrapped up in something.” According to the State as well as the trial court’s factual findings, Officer Thomas then asked Gales what was in his pocket, and Gales voluntarily pulled the money out, claiming he had just won it gambling.[2] Because Gales voluntarily showed Officer Thomas the money, Gales no longer had a “reasonable expectation of privacy” as to the money under the Fourth Amendment. Katz v. United States, 389 U.S. 347, 359, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J. concurring). Officer Thomas’s suspicions were piqued, resulting in his requesting a fresh description, which was more accurate and partially matched Gales.
¶ 18. “The rationale underlying the Terry stop is the protection of the officer.” Ellis v. State, 573 So.2d 724, 725 (Miss.1990). To that effect, the U.S. Supreme Court has said that the search “must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer.” Terry, 392 U.S. at 29, 88 S.Ct. 1868. “When an object is soft or does not reasonably resemble a weapon, the Terry analysis does not justify removing it from the suspect’s clothing and searching it.” Ellis, 573 So.2d at 725 (citing 3 W. Lafave, Search and Seizure § 9.4(b) (2d ed. 1987)). It is noteworthy that, unlike in the case sub judice, the police officer in Ellis testified that he had suspected the object he felt during the Terry pat-down to be drugs and did not testify that he was concerned about a concealed weapon. Id. • Additionally, “[sjince Terry, [the U.S. Supreme Court has] held repeatedly that mere police questioning does not constitute a seizure.” Florida v. Bostick, 501 U.S. 429, 434, 111 S.Ct, 2382, 115 L.Ed.2d 389 (1991); see also United States v. Shabazz, 993 F.2d 431, 436 (5th Cir.1993).
¶ 19. Here, Officer Thomas was pursuing an armed robbery suspect who was *640 last seen brandishing a pistol. Officer Thomas had reason to believe that Gales might have been armed, necessitating a frisk of his person. While Officer Thomas did not feel anything that was immediately recognizable as a weapon, he felt a unknown bulge in Gales’s pocket, prompting concern for his safety. Despite his concern, Officer Thomas did not search Gales’s pocket but merely asked what was in it. Gales voluntarily emptied his pockets, showed the money to Officer Thomas, and claimed that he had won it gambling. Based on these facts, the trial court did not err in finding that Officer Thomas constitutionally performed a Terry pat-down.

C. Gales’s Continued Detainment and Officer Arendale’s Conduct

¶ 20. Gales also argues that his continued detainment after Officer Thomas handcuffed him and Officer Arendale’s searches exceeded the scope of Terry. Gales alternatively argued at the suppression hearing that he was arrested when Officer Thomas handcuffed him and brought him to the crime scene, and the officers should have Mirandized[3] Gales at the point of arrest. In its brief, the State did not respond to the alleged Terry violations stemming from Officer Arendale’s conduct other than saying that it was “justified and permissible.” The State further argues that Officer Thomas’s encounter with Gales was a Terry stop; thus, Officer Thomas was not required to Mirandize Gales as he was not yet under arrest.
¶ 21. After the hearing on Gales’s motion to suppress, the trial court entered an order denying the motion and finding that Officer Thomas’s stop and pat-down of Gales was proper under Terry. While the order mentioned that Officer Thomas took Gales to the crime scene, it did not analyze the fact under Terry. The order referenced Officer Arendale’s taking pictures of the money but failed to mention his emptying Gales’s pocket. The order stated that “Officer Jeremy Arendale testified the accused was arrested when a stamped bill was confirmed by the owner to be one of his stolen bills.”
¶ 22. While the Court agrees with the trial court’s order that Officer Thomas’s initial stop and pat-down was proper, upon de novo review, the trial court erred in restricting its analysis to the initial stop and not further analyzing Gales’s prolonged detainment and searches by Officer Arendale. The U.S. Supreme Court has stated that Terry searches are “confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer.” Terry, 392 U.S. at 29, 88 S.Ct. 1868. Officer Thomas already had conducted a proper Terry search, concluding that Gales was unarmed and had only money in his pockets. While an additional search may have been justified to further ensure officers’ safety, Officer Arendale did not pat-down Gales for weapons but instead took money from his pockets and showed it to Weber, who recognized the stamped bill.
¶ 23. Officer Thomas’s continued detainment- of Gales and Officer Arendale’s conduct in taking Gales’s money are not congruent with Terry. Gales was in custody, having been handcuffed and placed in a police cruiser. The officers had ample time to attain a search warrant, which would have made Officer Arendale’s actions decisively proper. Regardless, the trial court correctly determined Officer Arendale’s actions were “justified and permissible,” although potentially under a different rationale, as Gales no longer had a *641 “reasonable expectation of privacy” after he voluntarily showed Officer Thomas his money. Katz, 389 U.S. at 360, 88 S.Ct. 507. See also Dies v. State, 926 So.2d 910, 918 (¶¶ 23-24) (Miss.2006). Alternatively, if the officers determined that probable cause existed following Officer Thomas’s Terry pat-down, the officers could have arrested him at that point, potentially allowing the officers to conduct a search incident to arrest. However, Officer Aren-dale testified that he did not arrest Gales until after Weber identified the stamped bill. As Gales argues, “if Arendale had probable cause to arrest based on what he learned following the search at the Food Mart [that Weber recognized the bill], then clearly he did not have probable cause to search [Gales] when [he] arrived at the scene with Thomas.”
¶24. The trial court erred in finding that Gales was not arrested until the bill was confirmed by Weber to be one of the stolen bills. When Officer Thomas handcuffed Gales, placed him in his cruiser, and transported him to another location, Gales was “effectively seized for the purposes of the • Fourth Amendment. These circumstances surely amount to a show of official authority such that a reasonable person would have believed he was not free to leave.” Florida v. Royer, 460 U.S. 491, 501-02, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (quoting United States v. Mendenhall, 446 U.S. 544, 554,100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). Because his detainment would qualify as a Fourth Amendment seizure, the arresting officers were required either to attain a search warrant or to find an applicable exception to the warrant requirement in order to search Gales.
¶ 25. Because Officer Arendale’s subsequent searches of Gales prior to his being placed under arrest may have exceeded the scope of Terry, we must also analyze whether Gales’s arrest and subsequent searches were legally justified.
II. Whether, assuming that Gales was arrested when Officer Thomas placed him in his police cruiser, Officer Thomas had probable cause to arrest Gales and Officer Arendale had a proper basis to conduct a warrantless search of Gales’s person.

A. Probable Cause

¶ 26. Before analyzing whether Officer Arendale’s search of Gales was proper, the Court must first determine whether probable cause existed to place Gales under arrest. “Probable cause exists when the facts and circumstances within an officer’s knowledge or of which he has reasonable trustworthy information, are sufficient in themselves to justify a man of average caution in belief that a crime has been committed and that a particular individual has committed it.” Hall v. State, 455 So.2d 1303, 1304 (Miss.1984) (citing Holland v. State, 263 So.2d 566 (Miss.1972)). The test for probable cause is not reducible to “precise definition or quantification.” Maryland v. Pringle, 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003). “Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence ... have no place in the [probable-cause] decision.” Illinois v. Gates, 462 U.S. 213, 235,103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). “All [the U.S. Supreme Court has] required is the kind of ‘fair probability1 on which ‘reasonable and prudent [people,] not legal technicians, act.’ ” Florida v. Harris, — U.S. —, —, 133 S.Ct. 1050, 1055, 185 L.Ed.2d 61 (2013) (quoting Gates, 462 U.S. at 238, 231,103 S.Ct. 2317).
¶27. Here, Officer Thomas responded to dispatch’s description of armed *642 robbery suspects in the vicinity of the Hyatt Food Mart. While the initial description of the suspect was inaccurate, Officer Thomas noticed a suspicious individual running away from the Hyatt Food Mart. Officer Thomas saw that the man began walking upon noticing police presence. Officer Thomas properly performed a Terry stop and pat-down of Gales. While Gales was detained, Officer Thomas noticed that he was sweating, appeared nervous, and was wearing light clothing on a cold December night. Gales voluntarily showed Officer Thomas wads of money, which he claimed he had won gambling. Officer Thomas then asked dispatch to repeat the description of the suspect. Dispatch then had a more accurate description of the suspect, describing an individual with a black hoodie, light blue jeans, and brown casual shoes. Gales matched the description, other than the black hoodie.
¶ 28. Based on the totality of the circumstances, there was more than enough information for a reasonable person to ascertain a fair probability that Gales had just committed the crime in question. Officer Thomas’s arrest of Gales was proper.

B. Exceptions to the Warrant Requirement

¶29. We return to the question of whether Officer Arendale’s subsequent search of Gales’s pockets and seizure of the money within were proper in the absence of a warrant. “Searches conducted without warrants have been held unlawful ‘notwithstanding facts unquestionably showing probable cause,’ Agnello v. United, States, 269 U.S. 20, 33, 46 S.Ct. 4, 70 L.Ed. 145, [ (1925) ] ... for the Constitution requires ‘that the deliberate, impartial judgment of a judicial officer ... be interposed between the citizen and the police....’” Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (quoting Wong Sun v. United States, 371 U.S. 471, 481-82, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). Searches conducted without a warrant are deemed “per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions.” Id.
¶ 30. Despite not having a warrant, Officer Arendale’s search of Gales’s money did not violate the Fourth Amendment. When Gales voluntarily took out his money and demonstrated it to Officer Thomas, Gales extinguished his “reasonable expectation of privacy” as to the money, just as when illegal contraband is in plain view of a police officer. Dies v. State, 926 So.2d 910, 918 (¶¶ 23-24) (Miss.2006). As the United States Supreme Court has stated, “once police are lawfully in a position to observe an item first-hand, its owner’s privacy interest in that item is lost....” Illinois v. Andreas, 463 U.S. 765, 771, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983). Alternatively, if Gales did not relinquish his constitutionally protected expectation of privacy, Officer Arendale’s conduct alternatively falls under an exception to the warrant requirement.
¶ 31. One exception to the warrant requirement is a search incident to arrest, which has been deemed a reasonable search permitted by the Fourth Amendment, even without a search warrant. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), overruled in part by Arizona v. Gant, 556 U.S. 332, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009). “Under the search incident to arrest scenario, police may search the arres-tee’s person and ‘the area “within his immediate control” — construing that phrase to mean the area within which he might gain possession of a weapon or destructible evidence.’ ” United States v. Johnson, 846 F.2d 279, 281 (5th Cir.1988) (quoting Chi *643 mel, 395 U.S. at 763, 89 S.Ct. 2034). “Law enforcement officers may, pursuant to a valid arrest, search any container on the person or within his reach.” Johnson, 846 F.2d at 282. However, the search must be substantially contemporaneous with the arrest. Id.
¶ 32. What qualifies as “substantially contemporaneous” is not controlled by a bright-line test; however, the Fifth Circuit wrote that the “search incident to an arrest must be reasonably contemporaneous to that arrest, but it is a test of reasonableness in light of the particular circumstances that must be applied.” United States v. Maslanka, 501 F.2d 208, 214 (5th Cir.1974) (citing Cooper v. California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967); Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964)); see also United States v. Edwards, 415 U.S. 800, 805-06, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974) (search of defendant’s clothes valid though conducted ten hours after arrest); Curd v. City Court of Judsonia, 141 F.3d 839, 843 (8th Cir.1998) (search of purse valid when conducted at police station fifteen minutes after defendant was arrested at home); United States v. Williams, 416 F.2d 4 (5th Cir.1969) (overcoming objections to an arrest-seizure delay of nine hours).
¶ 33. Here, Officer Thomas arrested Gales and immediately brought him to the crime scene. The robbery occurred around 10:00 p.m.; dispatch notified officers of the crime at 10:02; and Officer Thomas stopped Gales at 10:08. It is unclear how long it took Officer Thomas to drive to the crime scene, but the record suggests that it was shortly after he placed Gales in his cruiser. Officers were still investigating the robbery, as evidenced by their presence at the scene. Bringing suspects to the crime scene is not a standard policy of the Greenville Police Department; however, it has occurred in certain situations.
¶34. The record reflects that Officer Arendale’s search of Gales’s pockets and money qualifies as a search incident to arrest.
III. Whether the trial court erred by refusing to suppress any statements made by Gales prior to being properly Mirandized.
¶35. Next, Gales argues that he was not timely Mirandized when he was arrested. The following exchange, discussing when Officer Thomas placed Gales into his police cruiser, was the only time defense counsel questioned a witness — Officer Thomas — concerning Miranda at the suppression hearing:
Q: Beg the Court’s indulgence. Did you Mirandize him at any point?
A: Why would I Mirandize him if he wasn’t placed under arrest by me?
BY THE COURT: Sir, you can either say yes or no.
Q: You didn’t?
A: No.
Q: You didn’t Mirandize him?
A: No, because I didn’t arrest him.
. Q: I see. I believe that’s all.
After the suppression hearing, the trial court entered an order denying the motion to suppress. The order stated that Gales was arrested when the stamped bill was confirmed by Weber to be one of his bills and that Gales then was brought to the police station and read his Miranda rights. The order did not cite any law concerning Miranda; instead, it focused on the alleged Terry violations. The order concluded by stating the following:
Furthermore, the accused voluntarily removed the item from his back pocket. No action or conduct taken by this offi *644 cer was “sufficiently deliberate that the exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.” The officer’s action was good police work, not culpable conduct which must be deterred by the exclusionary rule.
¶ 36. In his brief, Gales argues that Officer Thomas violated Miranda by questioning him about the source of his money. Officer Thomas questioned Gales about the money during the Terry stop, which was just before Gales arrested. Gales voluntarily showed Officer Thomas his money, claiming he had won it gambling. Furthermore, nothing in the record indicates that Gales said anything at all after he was placed in Officer Thomas’s police cruiser, much less anything incriminating. According to Officer Arendale, Gales voluntarily got out of the police cruiser when brought to the crime scene, but the record is silent as to anything Gales said between the time of arrest and the time he was read his Miranda rights.
¶ 87. The Court has stated that “[e]ven in a case where a violation is demonstrated to have actually occurred, ... it will be considered harmless error if the whole record demonstrates beyond a reasonable doubt that it was without any substantial prejudicial effect under all of the facts and circumstances of the case.” Cooley v. State, 391 So.2d 614, 623 (Miss.1980) (citing United States v. Whitaker, 592 F.2d 826 (5th Cir.1979)). Here, it is not even clear that there was a Miranda violation, and the record does not demonstrate any potential prejudice, because the record does not state what, if anything, Gales said during the period in question. Further, the Court limits its review to the historical facts determined at trial.
¶ 38. The trial court did not abuse its discretion in determining that the exclusionary rule should not apply. As the trial court said in its order, Officers Thomas and Arendale did not deliberately act in such a way that the exclusionary rule would deter such future behavior. The officers were mistaken as to when Gales was arrested; however, nothing in the record suggests Gales said anything after being arrested, much less that he was interrogated, which is required for Miranda to apply. Miranda, 384 U.S.'at 439, 86 S.Ct. 1602. Therefore, the trial court did not err in refusing to suppress Gales’s statements prior to his being Mirandized.
¶ 39. Additionally, Gales did not discuss at trial or in his brief whether Officer Arendale may have violated Miranda. The Court consistently has held that alleged Miranda violations raised for the first time on appeal are procedurally barred. Stone v. State, 94 So.3d 1078, 1082 (¶ 12) (Miss.2012); see also Starr v. State, 997 So.2d 262, 266 (¶¶ 8-10) (Miss.Ct.App.2008). Thus, to the extent that Gales now alleges a Miranda violation committed by Officer Arendale, such an argument is, alternatively, procedurally barred. The issue is without merit, or, alternatively, procedurally barred.
IV. Whether the trial court erred when it failed to sustain Gales’s objection to Officer Arendale’s narrative of the video surveillance recording when the original video was available in violation of the best evidence rule.
¶40. In his next issue, Gales argues that Officer Arendale’s narration of the surveillance video prior to its being shown to the jury was plain error and violated the best evidence rule. Gales also argues that Officer Arendale’s testimony invaded the province of the jury as fact-finders, as he made factual determinations of the events occurring in the video.
*645 ¶ 41. The State counters that the best evidence rule provides only that “A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original.” Miss. R. Evid. 1003. The State also notes that the best evidence rule pertains only to documentary evidence. Quinn v. State, 479 So.2d 706, 709 (Miss.1985). It is permissible for a witness to narrate video evidence when the narration simply describes what is occurring in the video, but it is impermissible if the witness “attempts to place his own subjective interpretation of events transpiring in the video based on nothing beyond the witness’s own inspection of the contents of the videotape.” Pulliam v. State, 873 So.2d 124, 127 (¶ 18) (Miss.Ct.App.2004). However, the State contends that Gales did not assert such an objection at trial; thus the argument is waived. Even if the argument was not waived, the State argues that Officer Arendale’s narration consisted only of saying that a man said “good night” and a description of what the robbers were wearing, neither of which is a “subjective interpretation” of what hap-' pened.
¶ 42. The Court “retains the inherent authority to notice error to prevent the manifest miscarriage of justice, despite trial counsel’s failure to preserve the error.” Alpha Gulf Coast, Inc. v. Jackson, 801 So.2d 709, 727 (¶ 60) (Miss.2001) (citing Johnson v. Fargo, 604 So.2d 306, 311 (Miss.1992)). However, “[i]t is well-settled that issues presented for the first time on appeal are proeedurally barred from consideration.” Lewis v. Forest Family Practice Clinic, P.A., 124 So.3d 654, 658 (¶ 16) (Miss.2013).
¶ 43. First, the trial court did not err in overruling defense counsel’s objection, which was based solely on the best evidence rule. The best evidence rule applies to documentary evidence and is concerned with the authenticity of such evidence. Quinn, 479 So.2d at 709.
Where proof of a conversation has been of two different kinds, namely a recording thereof and testimony by witnesses who overheard it, it has been argued that both the recording and the testimony were best evidence; however, the courts have not relegated either to a secondary position, but have held that both types of evidence are equally competent primary evidence, and that one is not to be excluded because of the existence of the other.
Id. (quoting 29 Am. Jur. 2d, Evidence § 436 (1967)) (emphasis in original). Accordingly, the trial court did not err in overruling defense counsel’s objection, and the additional arguments raised by defense counsel — which do not rely on the best evidence rule — are proeedurally barred. With that said, we will fully examine defense counsel’s underlying argument in search of the alleged plain error.
¶ 44. Officer Arendale testified as a lay witness; thus his testimony must first pass the muster of Mississippi Rule of Evidence 701. Rule 701 requires lay witness testimony to be rationally based on the witnesses’s perception, helpful to understand his testimony or a .fact in issue, and not based on expert knowledge, which is controlled by Rule 702. Miss. R. Evid. 701. The comment to Rule 701 goes on to state, in part:
The traditional rule regarding lay opinions has been, with some exceptions, to exclude them from evidence. Rule 701 is a departure from the traditional rule. It favors the admission of lay opinions when two considerations are met. The first consideration is the familiar requirement of first-hand knowledge or *646 observation. The second consideration is that the witness’s opinion must be helpful in resolving the issues. Rule 701, thus provides flexibility when a witness has difficulty in expressing the witness’s thoughts in language which does not reflect an opinion. Rule 701 is based on the recognition that there is often too thin a line between fact and opinion to determine which is which.
Miss. R. Evid. 701 cmt.
¶45. “As the comment to [Rule] 701 explains, there is a two-part prerequisite test for the admissibility of lay witness opinion testimony. First, the information must assist the trier of fact; and second, the opinion must be based on first-hand knowledge.” Wells v. State, 604 So.2d 271, 278 (Miss.1992). There is no substitute for either requirement. Id.; see also Robertson v. State, 569 So.2d 691 (Miss.1990); Rose v. State, 556 So.2d 728 (Miss.1990); Jackson v. State, 551 So.2d. 132 (Miss.1989).
¶ 46. In the case sub judice, Officer Arendale narrated the surveillance footage of the Hyatt Food Mart robbery before it was shown to the jury. Officer Arendale stated that Justin Jones came to the front door and said “goodnight” to an employee; however, defense counsel did not object to the statements. Officer Arendale continued, stating that Jones exited, took a few steps, “looked behind him to see if anybody was looking at him,” and “fled on foot” out of view of the cameras. Officer Arendale then stated that, about fifteen seconds later, two black males came from the direction in which Jones had run. As Officer Arendale began to describe the individuals, defense counsel raised an objection under the best evidence rule, urging the trial court to play the video in place of Officer Arendale’s narration. The trial court overruled the objection, and Officer Arendale described the individuals in the video. Immediately after Officer Arendale’s narration, the trial codrt played the video for the jury.
¶ 47. Officer Arendale was not present at the time of the robbery; thus he did not have first-hand knowledge of the events that took place in the video. Additionally, the footage lacked audio, so a lay viewer, ■without having prior information, would not have been able to determine conclusively what was said. While Officer Aren-dále did not expressly speculate that Jones may have been casing the joint for the robbers, his testimony seems to imply the possibility. The majority of Officer Aren-dale’s narration consisted of descriptions of events that can be seen clearly in the video. It is noteworthy that Weber and Michael Burchfield, the employee to whom Jones talked prior to the robbery, were both testifying witnesses who had firsthand knowledge of the events that Officer Arendale described.
¶ 48. The trial court’s admission of Officer Arendale’s narration may have been improper; however, it did not amount to a miscarriage of justice necessary to constitute a plain error.
The witness should not tell the jury what they can clearly see for themselves on the tape, as [Officer Arendale] did. It naturally follows that if the jury can clearly see for themselves and if the witness is in. no greater position to relate what is depicted by personal observation of the events, then his opinion is not one which is helpful to the trier of fact.
Wells, 604 So.2d at 279. Moreover, Officer Arendale testified as to what Jones said to Burchfield, which cannot be heard in the video and was not heard by Officer Aren-dale; therefore, such testimony necessarily fails the firsthand observation prong of Rule 701.
¶49. However, the trial court’s improper admission of Officer Arendale’s narration did not amount to a miscarriage *647 of justice. First, defense counsel did not object contemporaneously to the testimony until Officer Arendale began describing the suspects; thus any argument to exclude the testimony prior to the objection is procedurally barred. Havard v. State, 928 So.2d 771, 793 (¶ 39) (Miss.2006). Even if the arguments were not barred, Officer Arendale’s simple description that Jones said “goodnight,” has little, if any, bearing on the case at hand. Such a statement is mere exposition to the armed robbery. While Officer Arendale may have implied that Jones may have had some connection with the robbers’ immediate, subsequent entry, he did not expressly state an opinion on the matter. Such a statement certainly is less speculative than the description in Wells, in which a lay witness, narrating a video of a cashier, speculated as to how the cashier was improperly taking money, which the Court deemed harmless error. See Wells, 604 So.2d at 280. The segment of Officer Ar-endale’s narration which followed defense counsel’s objection consisted merely of describing the individuals seen in the video, the recording system itself, and the chain of custody of the video. Therefore, while the trial court improperly admitted Officer Arendale’s narration of the video, defense counsel did not raise a proper objection to the narration. Thus, Gales waived the narration argument on appeal, and, regardless, the error does not amount to plain error because it did not result in a miscarriage of justice.
Y. Whether the trial court erred when it denied Gales’s motion to set aside the jury verdict for legal insufficiency in the prosecution’s case or, alternatively, denied Gales a new trial where the verdict was against the overwhelming weight of the evidence.
¶ 50. Gales’s final argument challenges the legal sufficiency of the verdict and also contends that the verdict was against the overwhelming weight of the evidence. In facing challenges to the legal sufficiency of the evidence, the relevant question for the Court is “whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Bush v. State, 895 So.2d 836, 843 (¶ 16) (Miss.2005) (quoting Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). “When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.” Bush, 895 So.2d at 844 (¶ 18).
¶51. Thus, as to the legal sufficiency, Gales argues that no rational trier of fact could have found Gales was one of the robbers. Gales attempts to bolster his argument by demonstrating the circumstantial nature of the case; for example, no one was able to identify Gales positively as one of the robbers, and the description of the robbers was vague and later was modified. Gales also argues Weber’s testimony demonstrated his inability to remember the robbery. Additionally, Gales repeats Officer Thomas’s statements that there were other black males on nearby streets when he stopped Gales, yet Officer Thomas did not stop those individuals.
¶ 52. As to the “overwhelming weight of the evidence” argument, Gales iterates that “blue jeans, brown shoes, and a red stamp on a five-dollar bill” are the only items of evidence that convicted him. Gales notes that the police never arrested the co-conspirator and that the black hoodie was not found until the next morning, de *648 spite searches that night. Gales also notes that the recovered money was not tested for Weber’s fingerprints.
¶ 53. The State counters by arguing that a rational jury could, and did, convict Gales of the crimes. The Mississippi Crime Lab found a particle indicative of gunshot residue on Gales’s hand, and the lab also matched the pistol found the next day with the spent shell casing recovered at the crime scene. Further, the fact that no other conspirators were charged does not preclude the finding of a conspiracy. While Gales was convicted by circumstantial evidence, it was sufficient for a rational juror to make a conclusion of guilt. Arguments regarding the weight of the evidence are to be decided by the jury as the finder of fact. Moore v. State, 969 So.2d 153, 156 (¶ 11) (Miss.Ct.App.2007).
¶ 54. The verdict was both legally sufficient and not against the overwhelming weight of the evidence. The majority of Gales’s stated arguments are factual in nature. “The weight and credibility to be given to a witness’s testimony ‘are within the sole province of the jury as fact finder.’-” Butler v. State, 102 So.3d 260, 268 (¶ 22) (Miss.2012) (quoting King v. State, 798 So.2d 1258, 1262 (Miss.2001)). “[The] Court has repeatedly held that ‘the jury is the final arbiter of a witness’s credibility.’” Howell v. State, 860 So.2d 704, 731 (Miss.2003) (quoting Williams v. State, 794 So.2d 1019, 1028 (¶59) (Miss.2001)). While much of the evidence sup porting Gales’s conviction was circumstantial, “[c]irumcumstantial evidence need not exclude every ‘possible doubt,’ but only every other ‘reasonable’ hypothesis of innocence.” Campbell v. State, 798 So.2d 524, 529 (¶ 13) (Miss.2002) (quoting Tolbert v. State, 407 So.2d 815, 820 (Miss.1981)).
¶ 55. Taking into account the role of the jury as the fact finder, as well as the evidence and testimony elicited by both parties, Gales’s verdict was both legally sufficient and not against the overwhelming weight of the evidence.

CONCLUSION

¶ 56. The trial court correctly determined that Officer Thomas performed a proper Terry stop and pat-down of Gales. However, the trial court erred in its determination that Gales was not arrested until Weber identified the five-dollar bill. Despite such error, upon de novo review, Officer Gales had probable cause properly to arrest Gales after Gales voluntarily showed him his money during the Terry stop. Further, Officer Arendale properly searched Gales incident to the arrest, allowing him to seize the money and show it to Weber. The trial court correctly determined that the exclusionary rule is not applicable in the case sub judice, in part because there was no Miranda violation. While the trial court improperly allowed Officer Arendale to narrate the surveillance video prior to its being shown to the jury, the decision of the trial court did not create a miscarriage of justice amounting to plain error. Finally, the correct legal standard was applied to Gales’s case, and the verdict is not against the overwhelming weight of the evidence. Therefore, the Court affirms the judgment of the trial court.
¶ 57. COUNT II: CONVICTION OF CONSPIRACY TO COMMIT ARMED ROBBERY AND SENTENCE OF FIVE (5) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT III: CONVICTION OF ARMED ROBBERY AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SENTENCES SHALL RUN CONCURRENTLY.
*649 WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., LAMAR, CHANDLER AND PIERCE, JJ., CONCUR. KITCHENS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, J.

. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

. There are some discrepancies as to what Officer Thomas said to Gales to prompt him to remove the money from his pocket. At the suppression hearing, Officer Thomas stated that he asked Gales what was in his pocket. Later during the hearing, Officer Thomas seems to say that Gales simply removed the money after the pat-down, without Officer Thomas asking anything. At trial. Officer Thomas testified that he had seen money hanging out of Gales's pocket, prompting him to ask Gales "Why do you have all this money?” Gales then produced the money and claimed he won it from gambling. Regardless of which account is the most accurate, the trial court found, relying on Officer Thomas’s testimony at the suppression hearing, that Gales voluntarily had produced the money.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).