# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00447-COA

**ALLEN M. RUSSELL A/K/A ALLEN RUSSELL**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                    **APPELLEE**

DATE OF JUDGMENT:              04/07/2022
TRIAL JUDGE:                          HON. JON MARK WEATHERS
COURT FROM WHICH APPEALED:   FORREST COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:       OFFICE OF STATE PUBLIC DEFENDER
                                      BY: W. DANIEL HINCHCLIFF
ATTORNEY FOR APPELLEE:        OFFICE OF THE ATTORNEY GENERAL
                                      BY: ALLISON ELIZABETH HORNE
DISTRICT ATTORNEY:             PATRICIA A. THOMAS BURCHELL
NATURE OF THE CASE:            CRIMINAL - FELONY
DISPOSITION:                   AFFIRMED - 10/17/2023
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., McCARTY AND SMITH, JJ.**

**SMITH, J., FOR THE COURT:**

¶1.     A Forrest County Circuit Court jury convicted Allen Russell of first-degree murder. The circuit court sentenced Russell to life imprisonment in the custody of the Mississippi Department of Corrections (MDOC) and ordered the sentence to run consecutively to any prior sentence imposed by the same or another court. On appeal, Russell argues the circuit court erred by allowing a State's witness to narrate the events depicted in a surveillance video as excerpts of the footage were played for the jury during the witness's testimony. Finding no reversible error, we affirm Russell's conviction and sentence.

## FACTS

¶2. On the morning of November 29, 2017, Hattiesburg police officers investigated a reported shooting at room 114 of the Deluxe Inn motel. Officers discovered a partially clothed man—later identified as Bobby Gwin—slumped in a corner of the room. Gwin had sustained three gunshots to his head and one to his arm. Officers found a condom wrapper on the carpet near some vomit. On the bed inside room 114, officers found shell casings, credit cards, and a folded piece of paper. The folded piece of paper turned out to be a hospital bill for Russell. The bill provided not only Russell's name but also his home address. Officers also found a cell phone in the room. The cell phone was missing its SIM (Subscriber Identity Module) card, which Sergeant Neal Rockhold testified was "what stores your identity on that phone."

¶3. In addition to Sergeant Rockhold, Lieutenant Dale Bounds and Detective Jeremy Dunaway both responded to the crime scene. Upon interviewing witnesses, the officers learned that a woman and her husband occupied the motel room beside Gwin's room. The woman reported hearing "pops" at 1:10 a.m. Lieutenant Bounds and Detective Dunaway also watched the Deluxe Inn's surveillance footage, which is the subject of Russell's appeal. The State introduced the surveillance footage into evidence during Lieutenant Bounds's testimony. But prior to Lieutenant Bounds's testimony, the State called Detective Dunaway as a witness. Although the State did not question Detective Dunaway on direct examination about the Deluxe Inn's surveillance footage, the subject arose during Detective Dunaway's cross-examination. Detective Dunaway stated multiple times on cross-examination that

2

Russell "was seen fleeing from the victim's room with a firearm in his hand, which [Russell] dropped [and then] picked up" before continuing to flee. The defense repeatedly questioned Detective Dunaway about what proof supported his statements that Russell entered Gwin's motel room and why other potential suspects were eliminated from the investigation. During this line of questioning, the following exchange occurred:

| | |
|---|---|
| [Detective Dunaway]: | [Russell's] belongings were left behind in that room. There was evidence of him in that room. There was no evidence of [two other potential suspects] being inside the victim's room. |
| [Defense Attorney]: | Mr. Russell was actually in that room for about two hours on and off, wasn't he, if you take it and add it all up together? |
| [Detective Dunaway]: | He was there for quite some time. |
| [Defense Attorney]: | And he left a medical bill with his name and his address on it, didn't he? |
| [Detective Dunaway]: | That's correct. |

¶4.    The defense also repeatedly questioned Detective Dunaway about whether the surveillance video clearly showed Russell leaving Gwin's room and holding a gun. In response to the defense's questions, Detective Dunaway maintained his recollection was that the surveillance footage showed Russell fleeing from Gwin's motel room with a gun in his hand that Russell dropped and retrieved. On redirect examination, the State asked Detective Dunaway for the first time about his recollection of the surveillance footage as it related to Russell. Detective Dunaway answered that from his recollection of the surveillance footage,

3

Russell could be seen entering Gwin's motel room and then quickly exiting around 1:15 a.m. Detective Dunaway believed Russell had returned to his apartment after Russell left the Deluxe Inn.

¶5.     The State then introduced into evidence both the surveillance footage and still photographs taken from the footage during Lieutenant Bounds's direct examination. Lieutenant Bounds testified that the footage showed a black male hurriedly exiting Gwin's motel room at 1:10 a.m. Lieutenant Bounds stated that the suspect wore "a camo jacket [with] black sleeves, black pants with slits on them, [and] metallic blue-gray looking tennis shoes" and carried "a Pittsburgh Steelers ball cap in his right hand and what I believed to be a cell phone also." Lieutenant Bounds further stated that the suspect in the video "had a goatee, kind of had like a little pot belly, [and] had a white T-shirt on . . . under the camo jacket with the black sleeves."

¶6.     After obtaining a search warrant for Russell's apartment, officers discovered Russell hiding in the attic and took him into custody. Sergeant Rockhold testified that he recovered a SIM card from inside Russell's apartment that he later learned was linked to a cell phone number for Gwin's mother. After obtaining samples of Gwin's and Russell's DNA, officers sent the samples and the vomit-stained carpet from room 114 for laboratory analysis. The test results showed that the DNA sample collected from the vomit-stained carpet at the Deluxe Inn matched the DNA sample obtained from Russell.

¶7.     Lieutenant Bounds and Detective Dunaway testified about certain items they collected

from Russell's apartment. Relevant to their investigation, the two officers found clothing items consistent with those worn by the suspect seen on the Deluxe Inn's surveillance footage. These clothing items included a Pittsburgh Steelers ball cap, a camo jacket with black sleeves, a pair of black pants with slits in the front, and a pair of metallic blue-gray tennis shoes. Lieutenant Bounds also stated that at the time of Russell's arrest, Russell wore a white sleeveless shirt and had both a goatee and a pot belly. Upon further questioning by the State, Lieutenant Bounds, without any objection from the defense, affirmatively identified Russell as the man seen on the Deluxe Inn's surveillance video who wore the same clothing items later recovered from Russell's apartment.

¶8. On cross-examination, the defense asked Lieutenant Bounds, "Was Allen Russell the only person at the Deluxe Inn that day [of Gwin's murder] wearing a camo shirt or a camo jacket?" Lieutenant Bounds responded, "To my knowledge, yes." At a later point during cross-examination, Russell's attorney questioned Lieutenant Bounds about the absence of a gun or any ammunition in Russell's possession at the time of Russell's arrest. The defense attorney then asked whether the entire case against Russell was based on the surveillance footage, and Lieutenant Bounds answered that officers collected other evidence, such as Russell's hospital bill found inside Gwin's motel room, that connected Russell to the crime. Following Lieutenant Bounds's response, the following exchange ensued:

[Defense Attorney]: Sure. I haven't heard anybody deny that Mr. Russell was present there at the Deluxe Inn . . . , have you?

5

[Lieutenant Bounds]:    I haven't.

[Defense Attorney]:    So do you know who else went into that room?

¶9.    On redirect, the State questioned Lieutenant Bounds for the first time about the absence of a gun found in Russell's possession, which the defense had raised during cross-examination. Lieutenant Bounds testified that the only gun-related evidence in the case included "[t]he spent shell casings and the rounds that were recovered out of the wall and out of Mr. Gwin" and what "appeared to be a firearm" in the possession of "[t]he person running out of room 114" at the Deluxe Inn. Lieutenant Bounds further testified that based on his observation of the surveillance footage, no one else entered Gwin's room after Russell exited at 1:10 a.m. In addition, Lieutenant Bounds stated he had uncovered no evidence during the investigation to show that someone other than Russell was involved in Gwin's murder.

¶10.    The State next called Deboriouse Badon as a witness. Badon testified that he and Russell were friends and that Russell was a fan of the Pittsburgh Steelers. According to Badon, on the night leading up to Gwin's death, Russell asked Badon to come to room 114 at the Deluxe Inn. Badon believed that a woman named Maya would be in room 114 along with him and Russell. Badon testified, however, that there was no woman present and that Gwin was instead there. Badon stated there was no evidence of vomit inside the motel room while he was there and that Russell and Gwin were the only people who remained in the room when he left around 11 p.m.

¶11.    Fellow inmate Steve Walker Jr. testified that he and Russell were in the same area of

6

jail in February or March 2019. According to Walker, on multiple occasions Russell admitted that he had "offed" Gwin. Walker stated, "[Russell] told me he met somebody on the Internet that he thought was a woman and went to go meet him[;] . . . it wound up being a man[,] and I guess things went wrong then."

¶12. As its final witness, the State called Detective Chadra Daniels, who led the investigation of Gwin's death. Like Detective Dunaway and Lieutenant Bounds, Detective Daniels testified that she had reviewed the surveillance footage at the Deluxe Inn. After watching three days of surveillance video, Detective Daniels created a timeline of surveillance-video events that she found relevant to her investigation into Gwin's death. Without any objection from the defense, the State introduced this timeline document into evidence during Detective Daniels's testimony. The State also entered into evidence an exhibit that contained an abbreviated version of the Deluxe Inn's surveillance video. The abbreviated surveillance video showed only the relevant events included in Detective Daniels's timeline.

¶13. During Detective Daniels's testimony, the State asked her to play the video excerpts in the chronological order provided on her timeline. Following each excerpt, the State questioned Detective Daniels about the events depicted in the footage. Detective Daniels testified that the video showed Gwin arrive at the Deluxe Inn on November 27, 2017, dressed as a male. After checking into room 114, Gwin later exited the room dressed as a female. Detective Daniels testified that Russell arrived at the Deluxe Inn the following day, on

November 28, 2017. Russell walked around the motel property for a while before eventually entering Gwin's room. About fifteen minutes later, the video footage showed Badon park his vehicle in front of room 114 and enter the motel room.

¶14. At this point during Detective Daniels's testimony, the defense raised an objection. The objection and related discussion occurred as follows:

[Defense Attorney]: Your Honor, I'm going to object to him [(the prosecutor)] continuing to read off of a document that's in evidence. It's in evidence. Part of my motion was that he not narrate, that nobody narrate. The evidence speaks for itself. I don't have a problem with Detective Daniels telling what she thinks she sees. . . .

The Court: Not to interrupt you, but let's kind of do it this way: Just move to whichever--in other words, you . . . tell her where to go and then let her narrate it.

[Prosecutor]: She'll be allowed to do that?

The Court: Yes. She [(the defense attorney)] doesn't object to that. Yes. I think her objection was she doesn't want you testifying.

[Defense Attorney]: That was my objection.

The Court: Is that correct?

[Defense Attorney]: That's it.

¶15. Upon resuming her testimony, Detective Daniels stated that the surveillance footage showed Badon exit room 114 and get into his vehicle. Badon started to back out of his parking spot before pulling back in the spot. Detective Daniels testified that Russell then exited the motel room, walked to the driver's side door of Badon's vehicle, spoke to Badon,

and walked back inside room 114. Badon next pulled out of the parking spot and left the motel. Detective Daniels stated that Russell later opened the door to room 114 once more for a few seconds before closing the door and thereafter remaining inside the motel room.

¶16. The following morning, on November 29, 2017, Demetrius Willis arrived at the motel. Detective Daniels testified that Russell opened the door to room 114, retrieved an item from inside the motel room, and handed the item to Willis. Detective Daniels stated that Willis never entered room 114, and Russell closed the motel room door again after handing Willis the unknown object. At 1:10 a.m., Russell opened the door to room 114 and unsuccessfully tried to close the door behind him as he exited the room. Detective Daniels testified that Russell began to run away from the motel room. As Russell rounded a corner of the motel, he "drop[ped] an item on the sidewalk area." Earlier in her testimony, Detective Daniels had stated that the footage showed the suspect, whom she later identified as Russell, "drop[] an object onto the sidewalk area. It appears to be a gun. [He b]ends down, picks up the gun, and places it back into his either left back pocket or left hip area and continues walking . . . ." Detective Daniels testified that after Russell exited room 114, the video showed that no one else entered the room until officers arrived to investigate.

¶17. Prior to Detective Daniels completing her testimony about the video excerpts, the defense raised another objection. Russell's attorney again stated that the defense did not "mind them narrating what you can see in the [video footage] frame" but requested that Detective Daniels not be allowed to narrate any events not specifically depicted in the video

9

frames. After the circuit court overruled the objection, Detective Daniels completed her testimony about the video excerpts taken from the surveillance footage.

¶18. On cross-examination, the defense asked Detective Daniels about the number of cameras at the Deluxe Inn and about Russell's movements around the property. Unlike during Detective Dunaway's cross-examination, the defense did not challenge Detective Daniels about her identification of Russell as the suspect seen on the surveillance footage. Instead, while questioning Detective Daniels, Russell's attorney asked, "So you saw Mr. Russell talking to the manager of the place that night, didn't you, on video?" Later, while questioning Detective Daniels about the vomit found inside room 114, Russell's attorney stated, "We don't deny [Russell] was there." Finally, while questioning Detective Daniels about the importance of the hospital bill found inside room 114, Russell's attorney asked, "To your knowledge, do we dispute [Russell] was in the room?" After the circuit court overruled the State's objection to the question, Russell's attorney then asked, "Have you ever heard me say [Russell] wasn't there?"

¶19. The State rested after Detective Daniels's testimony. After the defense presented its case-in-chief, the jury deliberated and found Russell guilty of first-degree murder. The circuit court sentenced Russell to life imprisonment in MDOC's custody and ordered his sentence to run consecutively to any prior sentence imposed against Russell by the same or another court. Russell filed an unsuccessful motion for judgment notwithstanding the verdict or, alternatively, a new trial. Aggrieved, Russell appeals.

**DISCUSSION**

¶20. Russell's sole argument on appeal is that the circuit court erred by allowing Detective Daniels to narrate the parts of the surveillance video played during her testimony. Because Russell's attorney failed to contemporaneously object to the narration at trial, though, Russell must rely on plain error. *See Fisher v. State*, 354 So. 3d 284, 288 (¶10) (Miss. 2022) ("Generally, a party who fails to make a contemporaneous objection at trial must rely on plain error to raise the issue on appeal, because otherwise it is procedurally barred." (quoting *Swinney v. State*, 241 So. 3d 599, 605 (¶13) (Miss. 2018))). Appellate courts employ plain-error review "for correcting obvious instances of injustice or misapplied law" and "only in situations when a defendant's substantive or fundamental rights are affected." *Swinney*, 241 So. 3d at 605 (¶14) (quoting *Green v. State*, 183 So. 3d 28, 31 (¶6) (Miss. 2016)). "To determine if plain error has occurred, [the appellate court] must determine if the trial court has deviated from a legal rule, whether that error is plain, clear, or obvious, and whether that error has prejudiced the outcome of the trial." *Id.* at 606 (¶15) (quoting *Conner v. State*, 138 So. 3d 143, 151 (¶19) (Miss. 2014)). Our caselaw holds that "[p]rejudice often is lacking when the weight of the evidence against a defendant is overwhelming." *Id.* (quoting *Hall v. State*, 201 So. 3d 424, 428 (¶12) (Miss. 2016)).

¶21. A witness is permitted "to narrate video evidence when the narration simply describes what is occurring in the video . . . ." *Carruthers v. State*, 348 So. 3d 1042, 1050 (¶20) (Miss. Ct. App. 2022) (quoting *Gales v. State*, 153 So. 3d 632, 645 (¶41) (Miss. 2014)). Thus, "the

11

State's asking Detective [Daniels] to describe what is happening in the video did not in itself raise any red flags requiring the trial court to intervene despite no objection by counsel." *Turner v. State*, 366 So. 3d 855, 862 (¶27) (Miss. 2023). A witness's video narration is impermissible, however, "if the witness attempts to place his [or her] own subjective interpretation of events transpiring in the video based on nothing beyond the witness's own inspection of the contents of the videotape." *Carruthers*, 348 So. 3d at 1050-51 (¶20) (quoting *Gales*, 153 So. 3d at 645 (¶41)). Here, Russell contends that Detective Daniels's narration crossed into impermissible subjective interpretation when she (1) testified that the suspect seen on the surveillance footage dropped and retrieved a gun and (2) identified the suspect as Russell.

¶22. As discussed, the defense never objected to Detective Daniels's testimony. In addition, the record clearly reflects that prior to Detective Daniels's testimony, both Detective Dunaway and Lieutenant Bounds had already similarly testified—without objection from the defense—that Russell was the suspect seen on the surveillance footage and that the footage showed Russell drop and retrieve what appeared to be a gun. Both Detective Dunaway and Lieutenant Bounds testified at length about the clothing and physical appearance of the suspect seen in the surveillance footage. The two officers also stated that they recovered matching items of clothing from inside Russell's apartment following his arrest and that Russell's physical appearance matched that of the suspect on the video. The jury also heard testimony that Russell's medical bill was found inside Gwin's motel room,

Russell's DNA matched the DNA taken from the vomit found inside Gwin's motel room, and the SIM card found inside Russell's apartment was linked to a cell phone number associated with Gwin's mother. Moreover, while cross-examining witnesses and during closing arguments, the defense repeatedly conceded that Russell was not only at the motel but also inside Gwin's room.

¶23. "Counsel's choice of whether or not to . . . call certain witnesses, ask certain questions, or make certain objections falls within the ambit of trial strategy." *Sandlin v. State*, 312 So. 3d 1191, 1197 (¶14) (Miss. Ct. App. 2020) (quoting *Hill v. State*, 850 So. 2d 223, 226 (¶14) (Miss. Ct. App. 2003)). Here, the defense pressed both Detective Dunaway and Lieutenant Bounds on their personal observations to support their identifications of Russell as the suspect seen on the video and their statements that Russell appeared to drop a gun as he left the motel. Rather than similarly challenge Detective Daniels's testimony regarding these matters, however, the defense made an apparently strategic decision to avoid these topics during her cross-examination, [a]nd the trial court cannot [now] be held in error for allowing trial counsel's chosen strategy." *Turner*, 366 So. 3d at 862 (¶28).

¶24. Further, during closing arguments, the defense attempted to use both the surveillance footage and the testimony about the video to Russell's strategic advantage. Russell's attorney pointed out that despite all the time spent discussing and watching the surveillance footage, the video failed to show that Russell actually shot Gwin. The defense further asserted that Gwin's facial hair was visible and that Russell would not have mistaken Gwin

13

for a woman—especially after the two spent several hours hanging out together in the same motel room. Finally, the defense attorney used the surveillance footage and related testimony to cast doubt as to the item that Russell dropped as he left the motel. According to the defense's argument, the State could not definitively identify the item as a gun "when every witness from the witness stand went to great lengths to say what appeared to be a gun."

¶25. Based upon our review of the record and relevant caselaw, we find that the alleged evidentiary error Russell now raises on appeal was neither obvious nor prejudicial. For the foregoing reasons, we find that no error—let alone plain error—arose from the circuit court's failure to sua sponte prevent Detective Daniels's now-disputed testimony as she narrated portions of the surveillance footage for the jury.

## CONCLUSION

¶26. Because we find no error, we affirm Russell's conviction and sentence.

¶27. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY AND EMFINGER, JJ., CONCUR. McDONALD, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**

14