# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2019-CT-00024-SCT

*MICHAEL SHANE BUFORD a/k/a MICHAEL S.*
*BUFORD a/k/a MICHAEL BUFORD*

*v.*

*STATE OF MISSISSIPPI*

## ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 09/27/2018 |
| TRIAL JUDGE: | HON. JOHN H. EMFINGER |
| TRIAL COURT ATTORNEYS: | MATTHEW ALLEN BALDRIDGE |
| | JEFFREY DIXON KNIGHT |
| | VICKY F. WILLIAMS |
| | BRAD MARSHALL HUTTO |
| | DEWEY KEY ARTHUR |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | HUNTER NOLAN AIKENS |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BARBARA WAKELAND BYRD |
| DISTRICT ATTORNEY: | JOHN K. BRAMLETT, JR. |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 08/05/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**KING, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     This Court must decide whether a police officer who has obtained consent to search

the person of another must obtain additional consent to search a specific, innocuous container

found on that person. The Court of Appeals found that the defendant's consent to the search

of his person encompassed the search of a smokeless tobacco can found in his pocket. We agree and affirm the decisions of the trial court and the Court of Appeals.

## FACTS AND PROCEDURAL HISTORY

¶2. In March of 2017, Sybil Brooks hired Jason Sebren to make repairs to a mobile home that she owned, and she allowed Sebren to live in the mobile home in exchange. Allegedly unbeknownst to Brooks, Buford began helping Sebren make the repairs, and he and his wife also moved into the mobile home. Subsequently, Sebren and Brooks had an argument, and Sebren moved out of the mobile home. Brooks stated that, because she did not have any agreement with Buford, the next day she told him to leave the mobile home. That same morning, Brooks also called the Pearl Police Department and stated that people were living in her rental house who did not have permission to be there.

¶3. Four law-enforcement officers were dispatched to the property. Officer Jeannine Easterling, who arrived first, testified that she initially knocked on the mobile-home door.[1] When Buford opened the door, she identified herself and told Buford why she was there. Officer Easterling testified that she asked Buford for any documents or proof that he was supposed to be at the home. Buford could not provide documentation. Officers Brad Winningham, Marc Gatlin, and Michael Bankston arrived approximately ten to twenty minutes later.

---

[1]Officer Easterling's maiden name was Jay. She had recently married at the time of the suppression hearing. For clarity purposes, the Court will refer to her using her married name, Easterling.

2

¶4. Officer Winningham testified that when he arrived, he asked Officer Easterling if Buford had been searched. Officer Easterling replied that he had not. Officer Winningham then asked Buford "did he have any issues with me searching him and he advised he did not." Officer Winningham conducted a search of Buford's person and felt a can of smokeless tobacco. He opened the tobacco can and observed what he believed to be crystal methamphetamine.

¶5. Buford was indicted for the possession of more than two grams but less than ten grams of a Schedule II controlled substance, namely methamphetamine. *See* Miss. Code Ann. § 41-29-139 (Rev. 2018). Prior to trial, Buford filed a motion to suppress all property and other evidence seized by law enforcement as the fruit of an illegal search and seizure. Buford argued that the officers failed to obtain a warrant or consent to search his person and the house where he was residing. Therefore, he contended that the officers conducted an unlawful detention and arrest and argued that all evidence obtained as a result must be suppressed.

¶6. During the suppression hearing, Buford testified that Brooks had told him to move out of the mobile home that morning. Buford stated that he told Brooks that he would be out by 5:00 p.m. that day but that Officer Easterling had arrived before he could move out. Buford testified that he told Officer Easterling to get a warrant but that Officer Easterling informed him that she would kick the door in. Buford said that, at that time, he walked to the back bedroom of the mobile home to talk to his wife. Buford's wife stated that Brooks would

3

make him pay for the door if the police kicked it in. Buford testified that he went back into the living room, cracked the door open, and the four police officers "shoved the door in." Buford testified that he never gave the officers consent to search the home or his person.

¶7.     The trial court asked Officer Winningham what basis he had to search Buford's person. He responded that he "had consent to search him for anything illegal and he authorized me to do so." The court again asked Officer Winningham what he had asked Buford. Officer Winningham responded, "I asked him does he have any issues with me searching him and he said, 'No, I do not,' and he put his hands out like this. (indicating.)." On cross-examination, Officer Winningham stated that he did not specifically ask for consent to search the tobacco can but said that he "asked him did he have any issues with me searching anything on him which would include that." Officer Winningham again testified that he had obtained consent to search "[a]ll items on [Buford] . . . but . . . not individual items. I didn't ask him individually for that can, no, sir." The trial court denied Buford's motion to suppress evidence.

¶8.     Buford was convicted as charged and sentenced as a subsequent drug offender and as a habitual offender to serve a term of sixteen years in the custody of the Mississippi Department of Corrections.

¶9.     The Court of Appeals found that Buford had consented to the search and that the consent had encompassed the smokeless tobacco can. *Buford v. State*, No. 2019-KA-00024-COA, 2020 WL 5793287, at *6 (Sept. 29, 2020). Therefore, it affirmed his conviction. *Id.*

4

Buford filed a petition for writ of certiorari with this Court and argued that the trial court and the Court of Appeals had erred by denying his motion to suppress evidence.

**ANALYSIS**

¶10.	The Constitution of the State of Mississippi protects people "in their persons, houses, and possessions, from unreasonable seizure or search." Miss. Const. art. 3, § 23; *see also* U.S. Const. amend. IV. "Section 23 of the Mississippi Constitution provides greater protections to our citizens than those found within the United States Constitution." ***Graves v. State***, 708 So. 2d 858, 861 (Miss. 1997).

¶11.	Unreasonable-search-and-seizure claims require a mixed standard of review. ***Eaddy v. State***, 63 So. 3d 1209, 1212 (Miss. 2011) (citing ***Dies v. State***, 926 So. 2d 910, 917 (Miss. 2006)). "Whether probable cause or reasonable suspicion exists is subject to a de novo review. But the Court limits the de novo review of the trial court's determination to 'historical facts reviewed under the substantial evidence and clearly erroneous standards.'" ***Id.*** (quoting ***Dies***, 926 So. 2d at 917). "In determining whether evidence should be suppressed, a trial court's findings of fact will not be disturbed on appeal absent a finding the trial court 'applied an incorrect legal standard, committed manifest error, or made a decision contrary to the overwhelming weight of the evidence.'" ***Crawford v. State***, 192 So. 3d 905, 923 (Miss. 2015) (quoting ***Simmons v. State***, 805 So. 2d 452, 482 (Miss. 2001)). "In reviewing the denial of a motion to suppress, we must determine whether the trial court's findings, considering the totality of the circumstances, are supported by substantial credible

5

evidence." ***Moore v. State***, 933 So. 2d 910, 914 (Miss. 2006) (citing ***Price v. State***, 752 So. 2d 1070, 1073 (Miss. Ct. App. 1999)).

### A. Illegal Detention

¶12.    Buford contends that the Court of Appeals overlooked his argument that his purported consent was given during a period of illegal detainment and, therefore, was ineffective. The Court of Appeals found that, because Buford's account of events was not corroborated and because he had not presented evidence that he was not free to leave the mobile home during questioning, he had not been illegally detained. ***Buford***, 2020 WL 5793287 at \*3-4.

¶13.    This Court initially must consider whether a detainment occurred in this case. A person "may not be detained even momentarily without reasonable, objective grounds for doing so . . . ." ***Florida v. Royer***, 460 U.S. 491, 498, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (Miss. 1983) (citing ***United States v. Mendenhall***, 446 U.S. 544, 556, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980)). "[A] show of official authority such that 'a reasonable person would have believed he was not free to leave'" amounts to a seizure under the Fourth Amendment. ***Id.*** at 502 (quoting ***Mendenhall***, 446 U.S. at 554). However, "[a]s long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification." ***Mendenhall***, 446 U.S. at 554. Thus, the applicable test is whether "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." ***Id.***

¶14. Buford argues that, "[a]t the time Buford allegedly provided consent, police had far exceeded the permissible scope of the investigatory detention at issue—to investigate Brooks' complaint that Buford was trespassing and should be removed from the trailer." Officer Easterling testified that, when she arrived at the mobile home, she began speaking to Buford at the door and that the two then moved into the living room. She stated that Buford did not ask for a search warrant or tell her not to come into the residence. She explained: "I told him why I was there. I identified myself, asked him a question. We were standing in the doorway of the trailer on a small step. We proceeded into the living room through the doorway. The door stayed open the whole time." Officer Easterling asked Buford if he could produce any documentation to show that he was authorized to be at the mobile home. Buford failed to produce any such documentation.

¶15. Buford asserts that when he could not produce documentation showing that he was authorized to be at the mobile home, Officer Easterling had employed the "least intrusive means" to investigate Brooks's complaint and her suspicions should have been considered justified. Therefore, Officer Easterling should have told Buford to leave and ended the detention. Because Buford had no right to be at the mobile home, we disagree. Buford admitted that Brooks had allowed Sebren to live in the mobile home and did not testify that she had authorized Buford to live there as well. Buford also admitted that Brooks had told Buford to leave the mobile home when Sebren moved out. Yet Buford did not leave the mobile home at that time. Brooks, the undisputed owner of the mobile home, had called the

Pearl Police Department and had stated that people were living in her mobile home who did not have a right to be there. Consequently, the police officers arrived at the mobile home in response to a trespassing call. The officers testified that Buford could not produce documentation that he was authorized to be at the mobile home. Buford does not dispute that contention. Accordingly, Buford had no right to be at the mobile home at that time. Buford cannot complain about the officers' continued presence at the mobile home in response to a trespassing call when he was not authorized to be there.

¶16.    Further, Buford did not testify that he attempted to leave the mobile home and was prevented from doing so. In fact, the officers were responding to a trespassing call; therefore, the officers arrived with the intent to get Buford to leave the mobile home.

¶17.    Although Buford argues that he had been "surrounded by four police officers in a rapidly escalating environment of intimidation[,]" as this Court has stated, "[i]t would be unrealistic to characterize every encounter between a citizen and a police officer as a seizure." *Jones v. State ex rel. Miss. Dep't of Pub. Safety*, 607 So. 2d 23, 27 (Miss. 1991) (citing *Mendenhall*, 446 U.S. at 555). "Consideration must be given to whether the circumstances were coercive, which necessitates attention to whether the person was confronted with many officers or a display of weapons, whether he was in custody and, if so, whether the circumstances of the custody were coercive . . . ." *Id.* "[S]ince *Terry*, [the U.S. Supreme Court has] held repeatedly that mere police questioning does not constitute a seizure." *Gales v. State*, 153 So. 3d 632, 639 (Miss. 2014) (second alteration in original)

8

(internal quotation marks omitted) (quoting *Florida v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991)).

¶18.     Officers may engage in voluntary conversation "no matter what facts are known to the officer since it involves no force and no detention of the person interviewed . . . ." *Singletary v. State*, 318 So. 2d 873, 876 (Miss. 1975). Officer Easterling's testimony was corroborated by Officer Gatlin's testimony that when he arrived at the scene, Officer Easterling, Buford, and Buford's wife were "right inside the doorway, which is the living room of the trailer, and they were talking in the living room." Officer Gatlin testified that he asked Buford why he was at the property. He stated that Buford said he had an agreement with the homeowner that if he helped with repairs he could live there. Yet Officer Gatlin stated that Buford could not produce any kind of lease agreement or paperwork, and he didn't "think [Buford or his wife] knew the homeowner's name." The evidence supports that the officers, in response to a trespassing call by the lawful owner, were engaged in voluntary conversation with Buford at a mobile home where Buford was not authorized to be. Because an illegal detention did not occur in this case, this issue is without merit.

¶19.     Buford further contends that he asked the officers for a warrant and that the officers had "shoved" their way into the mobile home. As the Court of Appeals stated, no evidence outside of Buford's testimony supports that version of events. "The trial judge has sole authority in determining witness credibility. Such a determination should not be overturned without a substantial showing that the trial judge was manifestly wrong." *Jones*, 607 So. 2d

9

at 28 (citing *Mullins v. Ratcliff*, 515 So. 2d 1183, 1189 (Miss. 1987)).

¶20.    Buford next argues that he had been detained because Officer Gatlin's body-camera recording shows that he had been handcuffed prior to being searched. We disagree with Buford's portrayal of the body-camera footage. Officer Gatlin testified that, before he manually activated his body camera, one of the other officers asked if he could search Buford and that Buford responded yes. He stated that Officer Winningham found a tobacco can in Buford's right front pocket, opened the can, and saw what appeared to be crystal methamphetamine. Officer Winningham then passed the can over to Officer Bankston who also opened the can and held up the bag of crystal methamphetamine. At that time, Officer Gatlin manually activated his body-camera video.[2] The body-camera video started at 2:32 p.m. Officer Gatlin stated that he had arrived at the location at approximately 2:25 p.m. Officer Gatlin testified that when his body camera is turned on, it captures the preceding thirty seconds of footage. When the video begins, Officer Bankston is seen holding the crystal methamphetamine, and Buford is in handcuffs.

¶21.    Thus, the recording appears to begin after Officer Winningham had discovered the tobacco can in Buford's pocket and supports Officer Gatlin's testimony that Officer Winningham had found the crystal methamphetamine and then had passed the tobacco can containing the substance to Officer Bankston. Additionally, Officer Winningham testified

---

[2]Officer Gatlin testified that the body cameras are automatically turned on when the blue lights in officers' vehicles are activated. However, because this was not an emergency situation, Officer Gatlin had not activated his blue lights before arriving at the location.

that, after he found the methamphetamine on Buford's person, he closed the can and handed it to Officer Bankston so he could arrest Buford and put him in handcuffs. Officer Winningham testified that Buford was handcuffed only after he found and opened the tobacco can. Officer Winningham seems to be adjusting the handcuffs shortly after the video begins. Also, when asked if Buford was handcuffed while he was being searched, Officer Easterling responded, "I don't recall. I do not believe so, but I don't recall. I do not think he was handcuffed at that time, no."

¶22. In contrast, counsel for Buford asked Officer Gatlin if Buford had been handcuffed while Officer Winningham was searching him, and Officer Gatlin responded, "Yes sir, I believe so. I—I can't recall." However, because the trial court's findings were supported by substantial evidence, its decision will not be disturbed.

¶23. The totality of the circumstances establish that the officers arrived at the mobile home in response to a trespassing call from the owner of the property and engaged in a voluntary conversation with Buford in an attempt to resolve the situation. Buford also had no right to be at the mobile home. Therefore, because substantial evidence supports the conclusion that Buford was not illegally detained, this issue lacks merit.

### B. Consent

¶24. Buford next argues that his consent to the search of his person did not extend to the closed tobacco can found in his pocket. "Mississippi has long recognized that a defendant can waive his or her rights under the warrant requirement by consenting to a search." *Graves*,

11

708 So. 2d at 863. "[A] search conducted pursuant to a valid consent is constitutionally permissible." ***Schneckloth v. Bustamonte***, 412 U.S. 218, 222, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). Consensual searches have long been approved "because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so." ***Florida v. Jimeno***, 500 U.S. 248, 250-51, 111 S. Ct. 1801, 114 L. Ed. 2d 297 (1991) (citing ***Schneckloth***, 412 U.S. at 219).

¶25.    It is important to note that the search performed by Officer Winningham was based only on the premise of consent. The trial court asked Officer Winningham what basis he had to search Buford and if he was conducting a pat down for weapons. Officer Winningham stated that Buford was trespassing and that he was not conducting a pat down but that he "had consent to search him for anything illegal and he authorized me to do so."[3]

¶26.    Buford asserts that a reasonable person who consented to a search of his person would not have understood that he also was consenting to a search of the contents of any closed containers on his person. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" ***Jimeno***, 500 U.S. at 251 (quoting ***Illinois v. Rodriguez***, 497 U.S. 177, 183-89, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990)). Therefore, the question this Court must answer is whether

---

[3]Thus, Buford's reliance on ***Anderson v. State***, 16 So. 3d 756 (Miss. Ct. App. 2009), in which an officer conducted a pat-down search for weapons, is misplaced.

12

it was reasonable for Officer Winningham to consider Buford's general consent to the search of his person to include consent to examine a smokeless tobacco can found in his pocket.

¶27. Officer Winningham stated that he did not specifically ask Buford if he could search the contents of the tobacco can. He stated that he asked Buford if he had any issues with Officer Winningham's searching him, and Buford responded that he did not. The United States Supreme Court has rejected the assertion that police must separately request permission to search each closed container found during a general search. *Id.* at 252. Because a reasonable person would be "expected to know that narcotics are generally carried in some form of container[,]" we disagree with Buford's contention that his general consent to the search of his person did not encompass the search of the tobacco can. *Jimeno*, 500 U.S. at 251.

¶28. Buford heavily relies on *May v. State*, in which a police officer asked a passenger in a vehicle that had been pulled over "if he would mind removing his shoes." *May v. State*, 222 So. 3d 1074, 1077 (Miss. Ct. App. 2016). The defendant stated that he did not mind and removed his shoes. *Id.* The officer then searched a lighter that fell out of the defendant's shoe and discovered a bag containing marijuana. *Id.* The Court of Appeals found that a reasonable person would not have understood that requesting a person to remove his shoes was a request to search the contents of any object contained in the shoes. *Id.* at 1081.

¶29. In *May*, the officer did not request consent to search the defendant but simply asked the defendant to remove his shoes. Here, Officer Winningham asked for, and was granted,

13

general consent to search Buford's person. As Buford was wearing only a pair of shorts, it cannot be said that he retained a reasonable expectation of privacy in the contents of a tobacco can found in his pocket. Additionally, "[i]f the consent occurred while the defendant was being generally cooperative, the consent is more likely to be voluntary; however, if the defendant agreed and then changed his mind, the consent should be suspect." *Graves*, 708 So. 2d at 863 (citing *Jones*, 607 So. 2d at 27). Officer Easterling testified that "[Buford] was actually very nice. He wasn't rude. He was friendly. He answered every question I had; actually, kind of approachable."

¶30.   We note that the Court of Appeals also found that "there is sufficient evidence supporting a determination that no impermissible search and seizure of the tobacco can and its contents took place because the tobacco can was in 'plain feel' in Buford's pocket." *Buford*, 2020 WL 5793287, at *5 (citing *Nowell v. State*, 246 So. 3d 77, 82 (Miss. Ct. App. 2018)). We agree with Buford's contention that the "plain feel" doctrine does not apply in this case. "If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity *immediately apparent*, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search . . . ." *Minnesota v. Dickerson*, 508 U.S. 366, 375, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993) (emphasis added). Officer Winningham could not have felt the smokeless tobacco can and determined that its identity was methamphetamine. Even so, we find that Buford's general consent to the search of his person extended to the search of the smokeless tobacco can found

14

in his pocket.

## CONCLUSION

¶31.   The totality of the circumstances support the conclusion that Buford was not authorized to be at the mobile home, that the officers arrived in response to a trespassing call, and that the officers proceeded to engage in a voluntary conversation with Buford regarding his presence at the location. Additionally, substantial evidence shows that Buford consented to a general search of his person. For these reasons, we affirm the decisions of the trial court and the Court of Appeals to deny Buford's motion to suppress.

¶32.   **AFFIRMED.**

**RANDOLPH, C.J., KITCHENS, P.J., COLEMAN, MAXWELL, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**