# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-01363-COA

**KYONE HALL A/K/A KYONE K. HALL A/K/A KYONE KENTHAE HALL**  APPELLANT

**v.**

**STATE OF MISSISSIPPI**  APPELLEE

DATE OF JUDGMENT:  12/01/2023
TRIAL JUDGE:  HON. GERALD W. CHATHAM SR.
COURT FROM WHICH APPEALED:  DESOTO COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:  OFFICE OF STATE PUBLIC DEFENDER
  BY: W. DANIEL HINCHCLIFF
  STACEY L. FERRARO
ATTORNEY FOR APPELLEE:  OFFICE OF THE ATTORNEY GENERAL
  BY: ABBIE EASON KOONCE
DISTRICT ATTORNEY:  ROBERT MORRIS
NATURE OF THE CASE:  CRIMINAL - FELONY
DISPOSITION:  AFFIRMED - 11/18/2025
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., EMFINGER AND WEDDLE, JJ.**

**EMFINGER, J., FOR THE COURT:**

¶1.    Kyone Hall was convicted of conspiracy (Count I) and aggravated assault (Count II) in the Circuit Court of DeSoto County, Mississippi.[1] On appeal, Hall contends that the trial court erred by allowing witnesses to provide a narration of a video being published to the jury and by allowing the witnesses to identify Hall in the video. Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.    Kyle Stewart was incarcerated in the DeSoto County jail when he was pulled from his

---

[1] Hall was also indicted for kidnapping (Count III).

top bunk while he was sleeping and severely beaten. At the time of the attack Stewart had been in the jail for only about a day and did not know the names of his attackers. After the attack, Stewart went to sleep without reporting the incident to anyone. The next day, Stewart told a guard about the attack and was sent to the medical facility in the jail, where he remained for what Stewart described as "a little over a month" with his mouth wired shut.

¶3.	According to Stewart, two individuals were initially involved in removing him from his bunk, and then a third person joined in. Stewart testified that everything happened very quickly. He could not recall the timing of everything that happened, but he did testify that he believed the assault lasted for roughly five to eight minutes. During the assault, Stewart attempted to get away from the attackers, but he testified that "someone would pull me back down."

¶4.	Sergeant Gary Harwood was called as a witness at trial by the State. He testified that he had been employed at the adult detention center for a little over three years. His job was to supervise the staff that had direct interaction with the inmates. Harwood told the jury that the detention center was divided into a "Charlie side" and a "Delta side." Each side has eight or nine pods that are basically open areas. At the front of each pod are tables, a television, phones, and a kiosk. In the middle, there are rows of bunk beds, with a little partition separating the bed space from the bathroom and shower area. Harwood testified that each pod could house between twenty and forty inmates. The beds are not assigned; they are taken "first come [,] first served." The lights are on in the pod from 4 a.m. until 10 p.m., when the lights are turned off, and the inmates are confined to their beds. Harwood supervises the

2

night staff and hands out a snack bag to the inmates every night, so he is face-to-face with the inmates on a regular basis.

¶5. The first Harwood knew of the attack was when he was called to the medical unit after Stewart was taken to be assessed by nurses. Stewart told him the attack had occurred the night before. Harwood then pulled up the video footage from that night and was able to see the attack. Then, at trial, Harwood authenticated a disc containing the video footage of the attack, and it was admitted into evidence without objection. As the video was being published to the jury, Harwood was given a laser pointer to explain to the jury where the attack was occurring on the video. He then, basically, narrated the video as it was being played. From time to time, the video was stopped, and Harwood was asked to point out specific areas. Harwood was able to identify two of the attackers "right off the bat." Hall, however, was first identified by Deputy Bulliner, also an employee at the adult detention center, because Harwood had not had much interaction with Hall at the time of the attack. However, after the attack, Harwood had regular interactions with Hall and was able to identify him as one of the attackers at trial.

¶6. Deputy jailer Taylor Bulliner testified at trial that he had been employed by the sheriff's department for five years at the adult detention center. His main duties include getting inmates ready to go to court and assisting in having inmates appear in court by video from the jail. Bulliner is also charged with investigating any actions of the inmates that may require disciplinary action. As part of his investigation of the attack on Stewart, he reviewed the video coverage of the incident. He authenticated a video of camera footage that was

3

edited for the jury in preparation for trial, and it was also admitted into evidence without objection.[2] Like Harwood, Bulliner was also given a laser pointer, which he used as the video was played for the jury. He told the jury that the attack occurred after 10 p.m., when most of the lights were out. As with Harwood, Bulliner began to narrate as the video was played for the jury.

¶7.     In order to identify the participants in the assault, Bulliner testified that in addition to the video from three cameras in the pod, he pulled up "Jail Tracker," a tool that provided him with pictures and information about every inmate in the pod. He was able to review the physical characteristics of each inmate. Details such as the inmate's body type, height, weight, information about the person's hair, and facial hair, among other things, were available to Bulliner in his effort to identify those responsible for the assault on Stewart. He authenticated the "Facility Admission Sheet" for Hall, and it was admitted into evidence without objection. In addition to this information, Bulliner told the jury that he viewed the video footage from the three cameras several times and was able to identify Hall because he was shirtless and was wearing thermal pants. As he followed Hall in the video based upon what he was wearing, Bulliner was able to get a good view of his face after the attack had ended. Bulliner identified pictures of Hall taken from the video footage, and they were admitted into evidence without objection. Bulliner was able to identify Hall based upon his physical characteristics and the way he walks. Bulliner identified Ryan Coltrain, Andrew

_____

[2] There were two videos played for the jury. The first was Exhibit 3, which was played during Harwood's testimony. The second was Exhibit 4, which was an edited version of Exhibit 3 prepared for trial and played during Bulliner's testimony.

Brown, and Hall as the persons who assaulted Stewart. On cross-examination, Bulliner told the jury that Hall has maintained "the same haircut and beard cut" for all the time he has known Hall. Bulliner also described how he viewed the videos several times. Bulliner stated that he would slow the video and sometimes pause the video to compare pictures and information from the admission sheets with the people in the video.

¶8. The State called Dr. Kenneth Thompson, the medical director at the DeSoto County jail, to testify regarding Stewart's injuries. Dr. Thompson was accepted as an expert in the field of emergency medicine. Dr. Thompson testified that Stewart had at least three fractures. He explained that two of the fractures did not require surgery. The third was a fracture to Stewart's jaw, for which he had to be transferred to Regional One because the DeSoto County jail did not have the facilities to provide the services Stewart needed. Regional One performed a maxillomandibular fusion, which was basically wiring his jaw shut. As a result, Stewart could eat only pureed foods that required no chewing. Communication was possible but, according to Dr. Thompson, "a bit of a challenge." Stewart's jaw was wired shut for about six weeks. When asked about the overall extent of his injuries, Dr. Thompson testified:

> Anything obviously that needs operative intervention is significant. You know, fortunately the other bones were not displaced and didn't require fixation, but you know, that could have been somewhat debilitating had he not had it fixed. You know, it could have caused him lifelong pain and, you know, difficulty eating and, you know, going forward, so.

¶9. After the State rested in its case-in-chief, Hall moved for a directed verdict, contending that the State had offered no proof of a conspiracy as charged in Count I, and as to the aggravated assault charge in Count II, the State had not proved that a weapon was used

5

or that Hall did anything that "manifested an extreme indifference for the value of human life." Further, the defense argued that the State had not produced sufficient proof to identify Hall as an attacker. As to the kidnapping charged in Count III, Hall argued that there was no proof that Stewart had been confined any more than any other inmate in the facility. The court denied Hall's motion for a directed verdict as to Counts I and II but granted a directed verdict as to Count III. Hall did not present any witnesses in his defense. The jury was given the instructions of law to be used in their deliberations and then heard the closing arguments of both sides.

¶10. The jury found Hall guilty of conspiracy to commit aggravated assault and guilty of aggravated assault. The court sentenced Hall to serve a term of five years for his conviction of conspiracy and to a term of twenty years for his conviction of aggravated assault, with the sentences ordered to run consecutively in the custody of the Mississippi Department of Corrections. After Hall's post-trial motion was denied by the court, he filed his notice of appeal. Hall's new counsel on appeal contends that his convictions should be reversed and his case should be remanded to the circuit court for a new trial. He argues that the trial court committed plain error by allowing Harwood and Bulliner to narrate the video as it was played for the jury and to give their opinion that Hall was one of the attackers. Hall asserts that their identification of Hall was "based solely on presumptions and deductions, rather than first-hand personal knowledge."

**STANDARD OF REVIEW**

¶11. Hall's sole issue on appeal is whether the trial court wrongfully admitted the evidence

discussed above. In *Hamer v. State*, 364 So. 3d 901, 907 (¶21) (Miss. Ct. App. 2022), we

explained our standard of review when considering admissibility of evidence:

> "Evidence admissibility is reviewed under an abuse of discretion standard."
> *Phillips v. State*, 285 So. 3d 685, 691 (¶19) (Miss. Ct. App. 2019). "Reversal
> is required only if the defendant can show that he was prejudiced or harmed
> by the exclusion of the evidence." *Id*. "A trial judge enjoys a great deal of
> discretion as to the relevancy and admissibility of evidence." *Shell-Blackwell
> v. State*, 305 So. 3d 1211, 1219 (¶23) (Miss. Ct. App. 2020). "Where error
> involves the admission or exclusion of evidence, [the reviewing court] will not
> reverse unless the error adversely affects a substantial right of a party." *Id*.

Hall concedes on appeal that no contemporaneous objection to the admission of the evidence

that he now seeks to challenge was made; therefore, the issue is procedurally barred from

consideration on appeal. However, Hall requests that we review the matter for plain error.

Concerning our consideration of plain error review, in *Fisher v. State*, 354 So. 3d 284, 288-

89 (¶¶10-11) (Miss. 2022), the supreme the court stated:

> [The Appellant] raises all of his arguments for the first time on appeal.
> "Generally, a party who fails to make a contemporaneous objection at trial
> must rely on plain error to raise the issue on appeal, because otherwise it is
> procedurally barred." *Swinney v. State*, 241 So. 3d 599, 605 (Miss. 2018)
> (internal quotation marks omitted) (quoting *Parker v. State*, 30 So. 3d 1222,
> 1227 (Miss. 2010)).
>
> The plain error doctrine permits this Court to "recognize obvious error which
> was not properly raised by the defendant and which affects a defendant's
> 'fundamental, substantive right.'" *Shinstock v. State*, 220 So. 3d 967, 970
> (Miss. 2017) (internal quotation marks omitted) (quoting *Conners v. State*, 92
> So. 3d 676, 682 (Miss. 2012)). "[T]o 'determine if plain error has occurred, we
> must determine if the trial court has deviated from a legal rule, whether that
> error is plain, clear[,] or obvious, and whether the error has prejudiced the
> outcome of the trial.'" *Green v. State*, 183 So. 3d 28, 30 (Miss. 2016) (second
> alteration in original) (quoting *Neal v. State*, 15 So. 3d 388, 403 (Miss. 2009)).
> Additionally, "[f]or the plain-error doctrine to apply, there must have been 'an
> error that resulted in a manifest miscarriage of justice or "seriously affect[s]
> the fairness, integrity or public reputation of judicial proceedings.'" *Hall v.*

*State*, 201 So. 3d 424, 428 (Miss. 2016) (second alteration in original) (quoting *Brown v. State*, 995 So. 2d 698, 703 (Miss. 2008)).

## ANALYSIS

¶12.    Because Hall failed to make a contemporaneous objection at trial, this issue is waived on appeal. *Jones v. State*, 411 So. 3d 265, 275 (¶26) (Miss. Ct. App. 2025). Hall, however, argues that without the testimony of Harwood and Bulliner identifying him as the attacker, he would not have been convicted. Accordingly, as explained, he seeks to have this Court undertake a plain error analysis.

¶13.    The issue of a witness narrating a video has been addressed several times by our appellate courts. Recently, in *Russell v. State*, 373 So. 3d 172, 178 (¶21) (Miss. Ct. App. 2023), this Court stated:

> A witness is permitted "to narrate video evidence when the narration simply describes what is occurring in the video. . . ." *Carruthers v. State*, 348 So. 3d 1042, 1050 (¶20) (Miss. Ct. App. 2022) (quoting *Gales v. State*, 153 So. 3d 632, 645 (¶41) (Miss. 2014)). Thus, "the State's asking Detective [Daniels] to describe what is happening in the video did not in itself raise any red flags requiring the trial court to intervene despite no objection by counsel." *Turner v. State*, 366 So. 3d 855, 862 (¶27) (Miss. 2023). A witness's video narration is impermissible, however, "if the witness attempts to place his [or her] own subjective interpretation of events transpiring in the video based on nothing beyond the witness's own inspection of the contents of the videotape." *Carruthers*, 348 So. 3d at 1050-51 (¶20) (quoting *Gales*, 153 So. 3d at 645 (¶41)). Here, Russell contends that Detective Daniels's narration crossed into impermissible subjective interpretation when she (1) testified that the suspect seen on the surveillance footage dropped and retrieved a gun and (2) identified the suspect as Russell.

In our case, the narration of the video of the attack in a pod of the adult detention center, for the most part, was in compliance with the court's ruling in *Russell*.

¶14.    The main thrust of Hall's argument on appeal is that Harwood and Bulliner were

allowed to give their opinions that Hall was one of the attackers seen in the video. Our supreme court addressed this issue in *Lenoir v. State*, 222 So. 3d 273, 276-77 (¶¶13-15) (Miss. 2017):

> While this Court has yet to address the admissibility of opinion testimony identifying a person in a video under Rule 701, the Mississippi Court of Appeals has. In *Bennett v. State*, 757 So. 2d 1074, 1076 (Miss. Ct. App. 2000), the Court of Appeals looked to other jurisdictions that had addressed this issue, finding "a majority view has developed that, at least under certain circumstances, such opinion evidence may be admitted to aid the jury." Particularly instructive was the federal case *United States v. Jackman*, 48 F.3d 1 (1st Cir. 1995). In *Jackman*, the First Circuit "concluded that [opinion identification] evidence ought to be admitted in any circumstance where it can be demonstrated that the witness has a greater familiarity with the defendant's appearance than the jury could possess and the recorded likeness is not either (a) so unmistakably clear, or (b) so hopelessly obscured, that the witness is no better suited than the jury to draw a meaningful conclusion as to the identity of the person depicted." *Bennett*, 757 So. 2d at 1076 (citing *Jackman*, 48 F.3d at 4-5).
>
> . . . .
>
> We agree with the Court of Appeals. "When there is a genuine issue of fact as to who is actually portrayed in a photograph or videotape, it is that sort of lay opinion evidence that can prove 'helpful' to the jury within the meaning of Mississippi Rule of Evidence 701." *Id*. In this case, the video was neither "so unmistakably clear" that no identification testimony was needed nor "so hopelessly obscured, that the witness is no better suited than the jury to draw a meaningful conclusion as to the identity of the person depicted." *Id*. at 1076. So the trial court was within its discretion to admit testimony by "a witness [who] has greater familiarity with the defendant's appearance than the jury could possess." *Id*.

¶15.    In the present case, after our review of the videos admitted into evidence, we find that the videos were not "so unmistakably clear" that no identification testimony was needed. *Id*. Further, we find that the videos were not "so hopelessly obscured, that the witness is no better suited than the jury to draw a meaningful conclusion as to the identity of the person

9

depicted." *Id*. It is true that Harwood and Bulliner were the only witnesses who identified Hall as one of the inmates who attacked Stewart. Based upon their testimony at trial, Harwood and Bulliner were more familiar with Hall's appearance and the way he walked than was the jury. They were able to view the videos multiple times while slowing down the videos, pausing the videos, or zooming in on parts of the videos. They were also able to consider other available information concerning the physical appearance of all the other inmates in the pod so as to be able to eliminate many of the inmates based upon their physical characteristics. In other words, Harwood and Bulliner were better suited than the jury to draw a meaningful conclusion as to the identity of the three inmates who attacked Stewart. Finally, the jury was instructed:

> You are the sole judges of the facts. Your duty is to determine what weight and what credibility will be given the testimony and supporting evidence of each witness in this case. You are required and expected to use your good common sense and sound honest judgment in considering and weighing the testimony of each witness who has testified before you.

**CONCLUSION**

¶16.    We find that both Harwood and Bulliner were qualified to give their lay opinions that Hall was one of the inmates who committed an aggravated assault upon Stewart pursuant to Mississippi Rule of Evidence 701. We find no error that resulted in a manifest miscarriage of justice or that seriously affected the fairness, integrity, or public reputation of judicial proceedings in this case to demonstrate plain error. Accordingly, we affirm Hall's convictions and sentences for conspiracy to commit aggravated assault and aggravated assault.

10

¶17.   **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., LAWRENCE, McCARTY, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. WESTBROOKS AND McDONALD, JJ., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**